CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
SEP 28 2010
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ROBERT A. MORRISON, <br> Plaintiff, | ) Civil Action No. 7:08-cv-00643 <br> ) <br> ) |
| v. | ) MEMORANDUM OPINION <br> ) |
| SERGEANT JORDAN, et al., <br> Defendants. | ) By: Hon. Jackson L. Kiser <br> ) Senior United States District Judge |

Robert Morrison, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1343. Morrison named as defendants Albemarle County; Colonel Matthews, the Superintendent of the Albemarle-Charlottesville Regional Jail ("Jail"); and Jail correctional officers Lieutenant Booker, Sergeant Jordan, Corporal Burgess, and Officer Colbert. Morrison alleges that the Jail's correctional officers and Superintendent violated his constitutional right to be free from excessive force and seeks damages as relief. I previously granted Albemarle County's motion to dismiss and terminated it as a party, and I granted in part the remaining defendants' motion to dismiss. Presently before me are plaintiff's remaining Fourteenth Amendment excessive force claims against Sergeant Jordan and Corporal Burgess and bystander liability against Lieutenant Booker. These remaining defendants filed a motion and supplemental motion for summary judgment, and plaintiff responded to each, making the matter ripe for disposition. After reviewing the record, I grant the defendants' motions for summary judgment.

I.

On October 28, 2008, Morrison was confined in the Jail's "FI Unit" as a voluntarily segregated pretrial detainee. (Compl. (no. 1) 4.) The FI Unit has six cells, side-by-side, with open-barred doors and a narrow day-room area running along the front of the cells' doors.

(Id.; Jordan Aff. (Def.s' Br. Supp. Mot. Summ. J. (no. 59) Ex. 1) ¶¶ 2-3.) Plaintiff's cell measured seven feet by five feet, which included the bunks, toilet, and sink. (Pl.'s Jan. Aff. (no. 75) ¶ 2.) The Jail assigned him to the FI Unit as a voluntarily segregated inmate because he refused a specific housing assignment, and the Jail requires inmates in voluntary segregation to relinquish their personal property as a disincentive for choosing this housing option. (Compl. 4; Jordan Aff. ¶¶ 2-3.)

At approximately 8 o'clock in the morning, Officer Colbert ordered Morrison to hand-in his personal property bin, but Morrison refused. Officer Colbert contacted his superiors, and Corporal Burgess, Sergeant Jordan, and Lieutenant Booker came to Morrison's cell. Sgt. Jordan and Cpl. Burgess twice ordered Morrison to place his back against the cell door and place his hands behind him in order to be hand-cuffed.

The parties' perspectives diverge with the following events. Morrison avers that he again refused the orders and remained sitting on his bunk. Sgt. Jordan pepper-sprayed Morrison for forty-five seconds, and the officers left the area. (Compl. 5.) Other officers removed the other five inmates in the FI unit from their cells. The defendants returned to Morrison's cell and repeated the order to "cuff-up" against the cell door, but Morrison "remained sitting on his bunk with a wet towel washing his face[;] he remained defiant to the order." (Id.) Sgt. Jordan or Cpl. Burgess pepper-sprayed Morrison again, and Lt. Booker opened the cell door. Cpl. Burgess, Sgt. Jordan, and Officer Colbert entered his cell.

Cpl. Burgess entered first, punching Morrison in the head and knocking him backwards on his bunk. (Id.) Morrison recoiled, lifting his knees and arms up around his head to guard against the blows. (Pl.'s Mar. 2010 Aff. (no. 86) 10.) Morrison avers he never "jumped up" or

2

hit his head on the top bunk. Jordan began punching Morrison and then, while holding on to the top bunk, began kicking Morrison, too. One of the kicks landed on the right side of Morrison's rib cage. The pain to his chest caused him to remove his arms from around his head, allowing Jordan to kick Morrison's head into the wall, causing unconsciousness. Upon waking, Morrison could see Booker standing at the unit door and watching the events. Morrison alleges that he never punched, kicked, flailed, or struck the defendants. (Compl. 5-6.) Another officer finally handcuffed Morrison while he laid face-down on his bunk.

The defendants aver that, after the defendants reiterated the order for Morrison to cuff-up, Jordan approached the cell and Morrison "took a defensive stance." Jordan's pepper-spray tool malfunctioned, spraying only a little pepper-spray for fifteen seconds, and Morrison washed his face in the sink and wrapped a towel around his mouth and nostrils. Morrison refused another cuff-up order and challenged the officers to go in and get him. Jordan and the other officers removed the other inmates affected by the pepper-spray and left the area for a few minutes.

Upon returning, they again unsuccessfully ordered Morrison to cuff-up. Booker then opened the cell door via an electronic control box outside the cell block, and Burgess entered the cell and ordered Morrison to remove the towel, stand up, and turn around. When Morrison refused, Burgess tried to spray Morrison with pepper-spray while unsuccessfully removing the towel from Morrison's head. At that moment, Morrison tried to stand up from the lower bunk but hit his head on the top bunk, which is made of steel or concrete. Immediately after Morrison's head hit the top bunk, Burgess tried to escort Morrison to the floor. However, Burgess slipped because of the pepper-spray, and he, too, hit his head on the top bunk while his glasses were falling off and he breathed in the pepper-spray. After both Morrison and Burgess

hit their heads on the top bunk and Burgess slipped, Morrison fell toward the bunk and again hit his head on the wall and bunk. Jordan then held Morrison down on the bed, and another officer handcuffed him.

Jordan and Burgess aver that at no time did anyone strike, hit, punch, beat, kick, do anything to try to injure Morrison in any way or use anything more than the least amount of force necessary to try to secure his property. (Jordan Aff. ¶ 9; Burgess Aff. ¶ 8.) Booker avers that he could not see into the cell from where he stood to operate the cell-door mechanism and that he neither heard nor saw anything at any time to indicate that any beating as described by Morrison occurred. (Booker Aff. ¶¶ 3-4.)

The parties agree that approximately five minutes later, staff brought Morrison to the Jail's medical unit from which Morrison was sent to the University of Virginia Medical Center ("Hospital"). The Hospital performed an X-ray of his chest and a CT-scan for a concussion, stitched a laceration behind his right ear, and treated various cuts, bruises, and welts. The Hospital released him back to the Jail the same day, where he was kept in the medical unit for approximately one week. However, Morrison reported to the Jail's infirmary on December 6, 2008, complaining about his concussion symptoms. (Pl.'s Mar. 2009 Aff. (no. 25) 6.)

II.

A.

Defendants request that I strike portions of Morrison's affidavit and the affidavit of other inmates as inadmissible. I must determine whether the affidavits and documents are properly filed for consideration before addressing the merits of defendants' motion for summary judgment. See Catawba Indian Tribe of S.C. v. South Carolina, 978 F.2d 1334 (4th Cir. 1992)

4

(holding that summary disposition is improper if based on affidavits which lack an affirmative showing of the affiant's personal knowledge). I also must review the admissibility of several other notable documents.

An affidavit opposing a motion for summary judgment must state facts that would be admissible in evidence. Fed. R. Civ. P. 56(e)(1). When an affidavit contains both inadmissible and admissible portions, courts are free to strike only the inadmissible portions. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). Similarly, if I do not rely on the affidavit at all, the affidavit's compliance with Rule 56(e) is practically irrelevant. See New England Anti-Vivisection Soc. Inc. v. U.S. Surgical Corp., Inc., 889 F.2d 1198 (1989) (holding that any error denying a motion to strike would be harmless because the court did not rely on the affidavit).

1. Affidavits regarding Officer Colbert

Inmate Michael Pritchett avers that he overheard Officer Colbert on November 6, 2008, tell Morrison that Colbert was sorry for what Jordan and Burgess did to him during the incident. Colbert allegedly also told Morrison that he was shocked when Burgess punched him and Jordan punched and kicked him. Inmate Frank Ferris submitted an affidavit that reiterates the same allegation. Inmate Cason submitted an affidavit claiming that Colbert told him in January 2009 that Jordan and Matthews told Colbert to deny in state court that the beating occurred. (Cason Aff. (no. 25) ¶ 2.) Colbert also allegedly told Cabon that Colbert felt terrible about what Jordan and Burgess did to Morrison. (Id.)

Morrison also filed an affidavit signed on March 15, 2009, in which he avers that Colbert told him that Colbert felt terrible about what Jordan, Burgess, and Booker did to him. (Pl.'s Mar.

2009 Aff. (no. 25) 1-2.) Colbert allegedly told plaintiff that Colbert wanted to testify how Jordan and Burgess punched, kicked, and beat him. (Id.) Colbert is not a party to this action, and no exception to the hearsay rule applies to these averments about what Colbert allegedly told inmates or Morrison. Accordingly, the Morrison, Pritchett, Ferris, and Cason affidavits are stricken from consideration to the extent they discuss what Colbert allegedly said about the incident.

2.  Morrison's Hospital and Jail medical records

In their first motion for summary judgment (no. 58), the defendants cite to Morrison's alleged medical records from the University of Virginia Health System ("UVA") that were attached as an exhibit. It appears the defendants failed to provide any documentation to support the authenticity or admissibility of these records. These records are not self-authenticating under Rule 902, Fed. R. Evid., and the defendants do provide any evidence of authenticity under Rule 901, Fed. R. Evid. See United States v. Blackwell, 224 U.S. App. D.C. 350, 694 F.2d 1325, 1329-30 (D.C. Cir. 1982) ("Authentication and identification are specialized aspects of relevancy that are necessary conditions precedent to admissibility."). Furthermore, none of the defendants' affidavits reference these medical records. Rule 803, Fed. R. Evid., exempts from the hearsay bar any record made by a regularly conducted business activity that is kept in the regular course of business and is made by a person with knowledge or from information transmitted by a person with knowledge. However, the defendants do not address these requirements for a business-record exception to the hearsay requirement.

Nevertheless, Morrison subsequently filed a copy of his UVA medical record that includes the same documents that the defendants provided, but he also included the statement of

certification by the records' custodian that the record was compiled by UVA during the regular course of treatment through December 30, 2009. (No. 78.) Accordingly, I will consider the UVA medical records.[1] However, Morrison also included a copy of photos and documents from the Jail's medical record without the documentation to support the authenticity or admissibility of them.[2] Therefore, I will not consider the Jail's unverified medical record. See Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993) (stating unauthenticated documents cannot be considered on a motion for summary judgment).

3.  The Differences between Plaintiff's Verified Complaint and Affidavits

Morrison submitted a verified complaint (no. 1) and an affidavit signed on January 11, 2010, ("January affidavit" (no. 75)) that describe the incident. In the verified complaint, Morrison states that he remained sitting on his bunk in defiance of the staff's orders to cuff-up. In his January affidavit, Morrison also told the officers, "'No, I [am] tired of this shit because I have not done anything wrong . . . .'" (Pl.'s Jan. Aff. ¶ 5.) Morrison refused a second order and then sat down on his bunk, and he denies he took any defensive stand against the officers. Cf. Jordan Aff. ¶ 3 (stating Morrison took a defensive stand).

Morrison states in his verified complaint that the officers repeated the order to cuff-up after removing the other inmates in the unit but Morrison remained defiantly sitting on his bunk.

---

[1] This docket entry, however, also includes an illegibly hand-written drawing of the F1 unit where the incident occurred; transcripts of Burgess', Jordan's, and Colbert's testimony about the incident during Morrison's state court criminal proceedings; Morrison's letter to the state court judge presiding over his state-criminal trial; and web page printouts about brain injuries. I will not consider the illegible drawing; the transcripts, which reflect the information provided in this action; plaintiff's letter; or the web page printouts because they are either not relevant or not admissible on the present record.

The defendants also request that I strike the portions of Morrison's affidavit that pertain to a pepper spray as an excessive force claim. The court already noted that the "pepper-spray as an excessive force" claim is not properly before the court, and Morrison acknowledges the same. See Pl.'s May Resp. (no. 99) 1-2.

[2] The photos show various welts and scratches on plaintiff's body.

7

(Compl. 5.) However, Morrison also states in his affidavit that he replied, "'No, and to go ahead and do what [you] need[] to do, but I [am not] going to 'cuff-up.'" (Pl.'s Jan. Aff. ¶ 8.) Morrison repeated that reply to another order to cuff-up.

Morrison states in his verified complaint that Burgess entered his cell first, punching him deeper into the bunk, with Jordan following. However, Morrison states in his January affidavit that Burgess entered the cell and first pepper-sprayed Morrison again, but Morrison continued to hold the wet towel over his nose and face and hide his face away from the spray. (Jan. Aff. ¶ 10.) After Morrison moved his head and curled his body up is when Burgess allegedly began punching him in the head.

The most critical difference between the verified complaint and the January affidavit is plaintiff's alleged injuries and his subsequent medical treatment. In the complaint, plaintiff insinuated that he had nine days of medical treatment at UVA following a second CT scan for his concussion symptoms. (Compl. 6-7.) However, Morrison now clarifies that he spent a week in the Jail's infirmary, not the Hospital, following the second CT scan. (Jan. Aff. ¶ 16.) Plaintiff's UVA record establishes that he spent less than three hours at the hospital after the incident. (Pl.'s Med. R. (no. 59 Ex. 5) at 4-5.)

Most notably, plaintiff averred in his complaint that he sustained a broken rib from the incident. (Compl. 6.) Included in the medical records is a October 28, 2008, Chest PA Single View (CXR) final report that indicates that plaintiff did not have his rib cracked by the defendants. See Pl.'s Med. R. (no. 78 at 73, 78). See also Pl.'s Mem. in Resp. (no. 86) 23 (acknowledging the report as part of his UVA medical record). The chest X-ray examiner noted

8

that "[i]f concern continues to rib pathology, recommend dedicated rib series."[3] (Pl.'s Med. R. (no. 78 at 73, 78)) The hospital's discharge instructions stated, "Rib Fracture[,] Prvt MD 5-7 days" accompanied with the text, "Follow up with your doctor to have the sutures [behind his ear] removed in 7 days." (Pl.'s Med. R. (no. 78 at 86).) However, this information, when read along with the X-ray examiner's note to follow up with a dedicated rib series, does not establish that plaintiff sustained a broken rib, especially since no other information in the medical record supports this conclusion. In his response to the defendants' supplemental motion for summary judgment, plaintiff recognizes that nothing in the record establishes plaintiff had a broken rib, and plaintiff does not state under penalty of perjury that he did, in fact, sustain a broken rib. Instead, plaintiff alleges that the X-ray report is "inconclusive" and that he suffered "significant rib injury." (Pl.'s Mem. in Resp. (no. 86) 23.) Thus, Morrison does not provide any conclusive evidence to show that he indeed had a rib cracked as a result of the incident. Furthermore, Morrison's two CT scans revealed no evidence of significant head trauma as a result of the incident, but Morrison alleges without support that a CT scan would not reveal a concussion.

B.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

---

[3]The report also noted:
> The cardiac silhouette is within normal limits. The mediastinum is within normal limits. The lungs demonstrate evidence of focal consolidation. There is no pneumothorax. There are no pleural allusions. The pulmonary vasculature is unremarkable. Osseous structures and soft tissues are unremarkable.

(Pl.'s Med. R. (no. 78 at 78))

9

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[4] Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts admissible as evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), or make determinations of credibility, Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and,

---

[4] The parties received reasonable and explicit notice that the court may convert a motion to dismiss that references matters outside the pleadings into a motion for summary judgment when the Clerk issued a timely Roseboro notice. See Fed. R. Civ. P. 12(d); Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975).

moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

C.

The defendants argue that they are entitled to qualified immunity because the plaintiff fails to state a claim upon which relief may be granted. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (modified by Pearson v. Callahan, 129 S. Ct. 808 (Jan. 21, 2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first)).

Qualified immunity is an immunity from suit rather than a mere defense to liability. A plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993). However, a defendant must demonstrate that the

right was not clearly established at the time of the incident to receive qualified immunity. Henry v. Purnell, 501 F.3d 374, 378 (4th Cir. 2007). Accordingly, in order to avoid summary judgment on the basis of qualified immunity, plaintiff must produce sufficient admissible evidence from which a jury could conclude that the defendants employed at least some force against him in a malicious or sadistic manner and that the violated constitutional right was clearly established at the time of the violation.

A pretrial detainee's claim of excessive force is governed by the Due Process Clause of the Fourteenth Amendment. Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008). See Bell v. Wolfish, 441 U.S. 520, 535 (1979) (stating that force against a pretrial detainee violates the Fourteenth Amendment when it amounts to punishment of the detainee and was not merely an incident of some other legitimate governmental purpose). To establish that a use of force is constitutionally impermissible "punishment," the pretrial detainee must show either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate non-punitive governmental objective, in which case an intent to punish may be inferred. Bell, 441 U.S. at 538-40. Thus, plaintiff must demonstrate that a defendant "inflicted unnecessary and wanton pain and suffering" upon him to succeed on this claim. Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998) (citing Whitley v. Albers, 475 U.S. 312, 320 (1986), abrogated on other grounds by Wilkins v. Gaddy, ___ U.S. ___, 130 S. Ct. 1175 (Feb. 22, 2010).

However, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547. Such deference "does not insulate from review actions taken in bad faith and for no legitimate purpose,

but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." Whitley, 475 U.S. at 322. Thus, "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." Id.

The determination of the infliction of unnecessary and wanton pain and suffering turns on whether the force was applied "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21 (internal quotation marks omitted). See Wilkins, 130 S. Ct. at 1178 (describing this as the "core judicial inquiry"). In Whitley, the Supreme Court set forth four non-exclusive factors to assist courts in assessing whether an officer has acted maliciously and sadistically: (1) "the need for the application of force"; (2) the extent of any reasonably perceived threat that the application of force was intended to quell; (3) "the relationship between the need and the amount of force that was used"; and (4) "any efforts made to temper the severity of a forceful response." 475 U.S. at 321 (internal quotations omitted). See United States v. Cobb, 905 F.2d 784, 789 (4th Cir. 1990) (endorsing consideration of similar factors used to determine whether an officer used excessive force against a detainee in violation of the Fourteenth Amendment). See also Hudson v. McMillian, 503 U.S. 1, 7 (1992) (extending the Whitley standard to all allegations of excessive force in violation of the Eighth Amendment).

13

(1) Factors 1 and 2: The need for the application of force and the extent of any reasonably perceived threat that the application of force was intended to quell

The defendants argue that their responses to Morrison's refusal to turn in his property bin "concern[] matters that fall within the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently." (Def.'s Br. Supp. First. Mot. Summ. J. (no. 59) 8.) Thus, defendants conclude that "[e]ntering an inmate's cell, in circumstances like this with an inmate who is angry and cursing the [defendants] and defying repeated orders to him, is a dangerous situation" and "Morrison's conduct left the [defendants] no choice in order to maintain compliance with Jail regulations and a safe and secure Jail[.]" (Def.'s Br. Supp. First. Mot. Summ. J. (no. 59) 4.) While I recognize jail officials' right to act, the particular matter at issue in this case was not the right to respond but the extent and physical severity of that response and its relationship to a reliable inference of wantonness.

However, it is clear that using physical force was necessary in this matter, and the officers reasonably perceived a threatening situation to enter a very small cell with an inmate who disregarded all orders to cuff-up and challenged the officers to come into the cell. Any attempt by an officer to enter the small cell would plainly require the officer to secure the occupant, and the parties all agree that Morrison repeatedly refused to cuff-up as a prerequisite to securing his property bin. Once Jordan and Burgess pepper sprayed Morrison, he washed his face in the sink and wrapped a towel around his face to further frustrate the officers' ability to compel compliance with the cuff-up orders. Furthermore, once the officers entered the cell, by Morrison's own admission, he remained defiant to the orders, refused to comply to being handcuffed, and curled up in a ball. Thus, the application of physical force necessary in this

matter would be to secure the plaintiff so the officers could enter the cell to safely remove his property bin.

(2)     Factor 3: The relationship between the need and the amount of force used

The absence of a serious injury is a relevant, although not dispositive, factor to determine wantonness. Wilkins, 130 S. Ct. at 1178 (citing Hudson, 503 U.S. at 7). "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Hudson, 503 U.S. at 7 (quoting Whitley, 475 U.S. at 321). "The extent of injury may also provide some indication of the amount of force applied." Wilkins, 130 S. Ct. at 1178.

The defendants argue that Morrison's CT Head scan and his chest X-ray revealed no abnormal findings related to the incident. (Def.'s Br. Supp. First Mot. Summ. J. (no. 59) 5.) In denying the defendants' motion to dismiss the complaint after noting the required perspectives, I stated, "[E]ven after I assume that some force may have been necessary, the force needed does not appear to equate to punching and kicking a pretrial detainee with such force to crack his ribs and require a hospital stay of more than a week." (Dec. 1, 2009, Mem. Op. (no. 52) 7.)

However, Morrison's medical record filed after that memorandum opinion no longer supports those factual perspectives. Instead, it appears Morrison suffered at most an alleged concussion, chest pain, and various bruises, welts, and cuts. Morrison stayed in the Hospital for less than four hours. Whereas a week-long hospital stay for a concussion and a broken rib may support a finding of wantonness, plaintiff's alleged injuries as supported by the record does not. The CT images and the chest X-ray do not indicate that plaintiff sustained any noteworthy injury

to support wantonness, and plaintiff does not provide any evidence that he indeed sustained a broken rib. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (stating that a party opposing a motion for summary judgment must come forward with specific facts showing that there is a genuine issue for trial). While I am not making a finding that plaintiff suffered de minimis injuries or that plaintiff's injuries are dispositive to this action, the lack of a serious injury in this case significantly impacts the wantonness analysis.

    (3)    Factor 4: Any efforts made to temper the severity of a forceful response

By Morrison's own admission, Jordan and Burgess repeatedly requested Morrison to cuff-up. After Morrison's persistent refusals, Jordan and Burgess used pepper-spray to compel Morrison's compliance. Despite the pepper spray, Morrison still refused to cuff-up, washed the pepper spray off his face, and wrapped a wet towel around his face to mitigate its effects. Even after the officers decided to use enter his cell to secure him, Burgess again re-ordered him to cuff-up, which plaintiff refused, and used pepper-spray before resorting to physical force. See Pl.'s Jan. Aff. ¶ 10. However, Morrison continued to hold the wet towel over his nose and face, hiding his face away from the spray. Id. Morrison frustrated all the officers' attempts to compel compliance without resorting to physical force, and with few options remaining, the defendants resorted to physical force to compel compliance.

    (4)    The evidence does not support a reliable inference of wantonness

After considering the Whitley factors, the record, and all inferences in a light more favorable to Morrison, the evidence does not support a reliable inference of wantonness, and thus, plaintiff fails to show that a defendant's conduct violated a constitutional right. The evidence does not support a reliable inference of wantonness because Burgess' and Jordan's use

of force was plausibly a good-faith effort necessary to maintain or restore discipline of a recalcitrant inmate and does not indicate an express intent to punish. By Morrison's own admission, he refused to turn-in his property bin and refused all orders to cuff-up. Any resulting injury of chest pains, a concussion, and scrapes do not infer an excessive amount of force to secure his involuntary compliance after he told the officers to come into the cell to get him, wrapped his face with a wet towel, and curled up in a ball against the wall in his bunk. Jordan and Burgess tempered their response by asking Morrison to comply and by using pepper spray. Morrison acknowledged that Burgess did not enter his cell to punch him in the head but still tried to resolve the matter with pepper spray instead of physical force. However, Morrison frustrated all of the officers' attempts to resolve the matter without force. Therefore, Jordan and Burgess are entitled to qualified immunity because the record indicates that "an alternative purpose to which [Burgess' and Jordan's acts] may rationally be connected is assignable for it and the[ir] action[s] do[] not appear excessive in relation to the alternative purpose assigned." Robles v. Prince George's County, 302 F.3d 262, 269 (4th Cir. 2002) (internal quotation marks omitted). See Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) ("Qualified immunity protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'"). Booker is also entitled to qualified immunity because it has not been established that he was confronted with a fellow officer's illegal act. See Randall v. Prince George's County, 302 F.3d 188, 203 (4th Cir. 2002) (stating that to prove bystander liability, a plaintiff must demonstrate that an officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act). Accordingly, the defendants are

entitled to qualified immunity, and I must grant the defendants' motions for summary judgment.[5]

III.

For the foregoing reasons, I grant the defendants' motions for summary judgment and deny as moot plaintiff's motion for a subpoena duces tecum.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to plaintiff and counsel of record for the defendants.

ENTER: This 28th day of September, 2010.

                                                        Senior United States District Judge

---

[5] Consequently, plaintiff's motion for a subpoena duces tecum is denied as moot. Plaintiff requests a neurological or psychological report that plaintiff believes establishes memory issues that may be attributable to the concussion allegedly sustained from the incident. Plaintiff does not know the contents of the report or understand how it relates to this action beyond his bare assertion that the report's unknown contents are "relevant" and "important." Even if these bare assertions were sufficient to invoke the court's reliance on the Marshals Service, this information is not necessary to this opinion because I analyzed the foregoing matters with the assumption that plaintiff suffered a concussion.